IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: § | | |
| § | | |
| DALE W. JACKSON, § | Case No. 08-41635 | |
|     Debtor. § | (Chapter 7) | |
| _____ § | | |
| FIRST COMMUNITY BANK - § | | |
| RICHARDSON, § | | |
|     Plaintiff, § | | |
| § | | |
| v. § | Adv. Proc. No. 08-4153 | |
| § | | |
| DALE W. JACKSON, § | | |
|     Defendant. § | | |

| | | |
|---|---|---|
| IN RE: § | | |
| § | | |
| PAUL KUNZE, III, § | Case No. 08-41637 | |
|     Debtor. § | (Chapter 7) | |
| _____ § | | |
| FIRST COMMUNITY BANK - § | | |
| RICHARDSON, § | | |
|     Plaintiff, § | | |
| § | | |
| v. § | Adv. Proc. No. 08-4154 | |
| § | | |
| PAUL V. KUNZ, III, § | | |
|     Defendant. § | | |

## MEMORANDUM OPINION

      In this adversary proceeding, the plaintiff is seeking a nondischargeable judgment in the principal amount of $480,800.29 based on claims of false financial statements, 11 U.S.C. § 523(a)(2)(B), and defalcation while acting in a fiduciary capacity, 11 U.S.C. § 523(a)(4). The plaintiff also requests its reasonable attorneys' fees pursuant to the terms of the underlying loan agreements. The Court exercises its core jurisdiction over this matter. *See*

U.S.C. §§ 157(b)(2)(I) and 1334.  This Memorandum Opinion embodies the Court's findings of fact and conclusions of law.  *See* FED. R. BANKR. P. 7052.

**I. FACTUAL BACKGROUND**

The plaintiff brought separate adversary proceedings against Dale Jackson and Paul Kunze.  The plaintiff's adversary complaints are based on the same allegations of fact and raise the same legal claims against each defendant.  The Court, therefore, tried the complaints together on April 13 and 26, 2010.  Following the conclusion of trial, the Court took the matter under advisement in order to prepare a detailed written ruling.

The defendants are the shareholders, officers and directors of Advanced Cabinet Technology ("ACT").  On or about March 4, 2007, ACT entered into a Universal Note and Security Agreement made payable to the plaintiff in the original principal amount of $100,000 (hereinafter, the "Purchase Money Note").  On or about August 23, 2007, ACT entered into another Universal Note and Security Agreement made payable to the plaintiff in the original principle amount of $400,000 (hereinafter, the "Line of Credit").  The Purchase Money Note and the Line of Credit were cross-collateralized by ACT's assets, including its accounts receivable and general intangibles.  In addition, the defendants personally guaranteed the Line of Credit and Purchase Money Note.

The plaintiff fully funded both the Purchase Money Note and the Line of Credit.  ACT used the proceeds in its ongoing business operations.  The Purchase Money Note provided that ACT was to repay the loan on demand or, if no demand was made, ACT was to make monthly payments of principal and interest from the inception of the loan through the maturity date on March 5, 2011.  The Line of Credit provided that ACT was to repay the loan

on demand or, if no demand was made, ACT was to make monthly interest payments through the maturity date on March 5, 2008.

William Greenhaw, senior vice president for the plaintiff, signed the Purchase Money Note and the Line of Credit for the plaintiff. He testified that the amount loaned to ACT under the Line of Credit was directly correlated to the amount of ACT's "borrowing base" under the Line of Credit. Although the Line of Credit does not use or define the term "borrowing base," Mr. Greenhaw requested that ACT provide the plaintiff with monthly reports describing its accounts receivable. The defendants complied, providing Mr. Greenhaw with Accounts Receivable Aging Reports (the "Monthly Reports") for each month beginning in September 2007.

Shortly after obtaining the Line of Credit, ACT discovered warping problems with the cabinet doors and drawers it had installed in five schools. The warping problems stemmed from materials ACT had purchased from an entity known as Funder America. The problems affected ACT's work for two general contractors: Hisaw & Associates ("Hisaw") and Pogue Construction Company ("Pogue").

The defendants attempted to negotiate a monetary settlement with Funder America. In early February 2008, while these negotiations were ongoing, Mr. Greenhaw contacted the defendants. Mr. Greenhaw expressed concern that the Monthly Report dated as of January 31, 2008, showed that the amount of ACT's accounts receivable had dropped below the balance of the Line of Credit. In addition, ACT's financial records showed that it was operating at a loss. It appeared to Mr. Greenhaw, however, that ACT was making progress toward achieving profitability.

3

During their conversations with Mr. Greenhaw in early February 2008, the defendants informed him of ACT's problems with Funder America and the ongoing settlement negotiations. ACT ultimately sued Funder America in Texas state court. Funder America removed the action to the United States District Court for the Northern District of Texas, Dallas Division, Case No. 3:08-CV-1128 (hereinafter, the "Funder America Lawsuit").

The Line of Credit matured by its terms on March 5, 2008. The plaintiff did not demand payment in full on that date. Instead, the plaintiff and the defendants began negotiating a formal renewal and extension of the maturity date.

In or around March 2008, ACT obtained a subcontract from a general contractor named Lee Lewis Construction, Inc., for a job located at Heritage High School in Frisco, Texas (the "Lee Lewis Job"). The defendants asked the plaintiff to provide ACT with the performance and payment bonds that were required for the Lee Lewis Job. The plaintiff declined. Thereafter, ACT obtained performance and payment bonds from SureTec Insurance Company ("SureTec"), which conditioned its issuance of the bonds on ACT's use of a funds disbursement program administered by a third party. ACT entered into a Funds Disbursement Services Agreement (the "Disbursement Agreement") with SureTec Information Systems, Inc. ("SISCO"). In order to effectuate the Disbursement Agreement, on March 25, 2008, Mr. Kunze sent a letter to Lee Lewis Construction requesting that all contract proceeds be sent to SISCO.

On April 8, 2008, the defendants, their accountant (Gary King), and their office manager met with Mr. Greenhaw in a small room at ACT's place of business. They discussed ACT's financial stability, future work and contracts, and the status of the Funder America Lawsuit, among other things. Mr. Greenhaw stressed the need for ACT to "shore

4

up" its receivables. During the meeting, Mr. King advised the defendants to create new receivable entries for "Garland Wynn Joyce – Doors" and "Garland Liberty Grove – Doors." The express purpose of these receivables was to account for ACT's expected recovery from the Funder America Lawsuit for the defective doors and drawers ACT had installed at Hisaw's jobs.

The receivable entries for "Garland Wynn Joyce – Doors" and "Garland Liberty Grove – Doors" first appeared on ACT's Monthly Report dated as of April 30, 2008. The Monthly Report dated as of April 30, 2008, also included ACT's interest in retainage held by Pogue for two jobs affected by the Funder America Lawsuit. The Lee Lewis Job first appeared on the Monthly Report dated as of May 31, 2008.

In late May or early June 2008, the plaintiff presented the defendants with the terms it would require ACT to meet in order to obtain a formal extension of the maturity date for the Line of Credit. Among other things, the plaintiff demanded that ACT significantly reduce the outstanding balance of the Line of Credit as a result of a decrease in the value of its receivables. ACT was unable to meet the plaintiff's demands. ACT and the defendants each filed petitions for relief under Chapter 7 of the Code on June 27, 2008.

When ACT filed for bankruptcy protection, ACT owed the plaintiff $73,756.40 under the Purchase Money Note and $407,043.89 under the Line of Credit. The Chapter 7 trustee subsequently declared ACT's case to be an asset case and invited ACT's creditors to file claims against the estate. The plaintiff filed timely proof of its claims against ACT.

At trial, the plaintiff complained that it had received little or no benefit from the receivables and other interests securing its claim. The plaintiff specifically complained that the Chapter 7 trustee settled the Funder America Lawsuit for only $90,000 and that

5

attorneys' fees were to be taken from the settlement proceeds before any payment to creditors. The plaintiff did not receive any of the retainage held by Pogue since, at some point, Pogue used the retainage that had been listed on the Monthly Reports to fix the defective doors and drawers installed by ACT. The plaintiff also did not receive any proceeds from the receivables listed on the Monthly Reports for the Lee Lewis Job. SISCO collected all of the receivables due to ACT pursuant to the Disbursement Agreement, and SureTec used the proceeds to satisfy claims for labor and materials provided to ACT on the Lee Lewis Job.

In its bankruptcy schedules, ACT listed the Funder America Lawsuit as an asset worth $141,000. The plaintiff did not object to the retention of counsel by the Chapter 7 trustee to pursue the Funder America Lawsuit on a contingency fee basis. In January 2010, the Chapter 7 trustee filed a motion proposing to settle ACT's claims against Funder America for $90,000 pursuant to Bankruptcy Rule 9019. The plaintiff did not object to the proposed settlement. The Court entered an order approving the proposed settlement in ACT's bankruptcy case on February 25, 2010.

## II. LEGAL DISCUSSION

In an action to determine the dischargeability of a debt, the plaintiff has the burden of proof under a preponderance of the evidence standard. *See Grogan v. Garner*, 498 U.S. 279, 286 (1991). "Intertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start." *Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997). Thus, without satisfactory

proof of each element of the cause of action, judgment must be entered for the debtor-defendant.

### A. 11 U.S.C. § 523(a)(2)(B)

Here, the plaintiff sought to establish at trial that the defendants misrepresented the financial condition of an insider, ACT, through the Monthly Reports. Section 523(a)(2)(B) of the Code provides that

> a discharge under §727 . . . of this title does not discharge an individual debtor from any debt for money, property, or services, . . . to the extent obtained by use of a statement in writing: (i) that is **materially false**; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property services or credit **reasonably relied**; and (iv) that the debtor caused or made to be published with the intent to deceive.

11 U.S.C. §523(a)(2)(B) (emphasis added). A statement is materially false for purposes of §523(a)(2)(B) if it paints a substantially untruthful picture of financial conditions by misrepresenting information of the type that would normally affect the decision to grant credit. *See, e.g., Investors Credit Corp. v. Batie (In re Batie)*, 995 F.2d 85 (6th Cir. 1993) (debtor signed financial statements regarding his net worth that were not true in connection with the purchase of a plane); *Community Bank of Homewood-Flossmoor v. Bailey (In re Bailey)*, 145 B.R. 919 (Bankr. N.D. Ill. 1992) (personal financial statements given by debtor in connection with loans were materially false, for dischargeability purposes, where they substantially overstated debtor's net worth and failed to mention mechanic's lien claim).

In this case, the plaintiff did not extend credit to ACT based on the financial information in the Monthly Reports. The Line of Credit had matured at the time the defendants provided the plaintiff with the Monthly Reports that the plaintiff alleges were false. The plaintiff and the defendants attempted to negotiate a forbearance agreement with

7

respect to the Line of Credit, but the negotiations were unsuccessful. The plaintiff nonetheless argues that the Court should find the defendants' obligations to the plaintiff non-dischargeable because it informally agreed to forbear collection of the Line of Credit based on the Monthly Reports provided by the defendants during negotiations. *See, e.g., Wolf v. Campbell (In re Campbell)*, 159 F.3d 963 (6th Cir. 1998) (finding debt nondischargeable under § 523(a)(2)(B) where debtor obtained a forbearance agreement by providing false financial information). The plaintiff argues that it reasonably relied on the Monthly Reports and that, by forbearing from collection, it lost the opportunity to seize ACT's receivables.

The alleged falsity of the Monthly Reports arises from the inclusion of the entries for "Garland Wynn Joyce – Doors" and "Garland Liberty Grove – Doors" in the Monthly Reports. The plaintiff asserts that the anticipated recovery from the Funder America Lawsuit was not an account receivable and should not have been included in any of the Monthly Reports. As an initial matter, however, the plaintiff has failed to show that the inclusion of the entries for "Garland Wynn Joyce – Doors" and "Garland Liberty Grove – Doors" in the Monthly Reports violated the terms of the Line of Credit. The Line of Credit, as previously discussed, does not use the term "borrowing base." The Line of Credit, instead, broadly defines the types of accounts that secure ACT's payment obligations, as follows: "All rights to payment, whether or not earned by performance, including, but not limited to, payment for property or services sold, leased, rented, licensed or assigned. This includes any rights and interests (including all liens) which I have by law or agreement against any account debtor or obligor."

Mr. Greenhaw closely monitored the Monthly Reports provided by the defendants. The defendants did not attempt to hide the financial problems ACT was experiencing in early

8

2008. Indeed, it was the Monthly Reports provided by the defendants that first alerted Mr. Greenhaw to ACT's problems. The defendants disclosed ACT's financial state, including the problems with the Hisaw and Pogue receivables listed in the Monthly Reports, to the plaintiff on numerous occasions. This Court, viewing defendants' conduct in light of the totality of circumstances surrounding the submission of the Monthly Reports to the plaintiff, concludes that the defendants did not publish materially false information with intent to deceive. *See, e.g., Texas Am. Bank v. Barron (In Re Barron)*, 126 B.R. 255, 260 (Bankr. E.D. Tex. 1991) ("The debtor's intent cannot be divined in a vacuum, but must be viewed in light of the circumstances.").

Further, the plaintiff failed to show that it actually and reasonably relied on a material misstatement by the defendants – assuming that the Monthly Reports contained such material misstatements. The determination of the reasonableness of a creditor's reliance is judged in light of the totality of the circumstances, taking into consideration:

- Whether there had been previous business dealings between the debtor and the creditor;
- whether there were any warnings that would have alerted a reasonably prudent person to the debtor's misrepresentations;
- whether minimal investigation would have uncovered the inaccuracies in the debtor's financial statement; and
- the creditor's standard practices in evaluating creditworthiness and the standards or customs of the creditor's industry in evaluating creditworthiness.

*Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 261 (5th Cir. 1993). The actual reliance requirement of § 523(a)(2)(B)(iii) is a factual determination. *Id.* at 260-261.

Applying these factors to the present case, the defendants had at least one business dealing with the plaintiff prior to entering into the Line of Credit, namely, the Purchase Money Note. The plaintiff and the defendants dealt with each other on a regular basis after entering into the Line of Credit in August 2007. ACT's Monthly Reports had contained

9

receivables due from Hisaw since at least October 31, 2007. Mr. Kunze testified, credibly, that Mr. Greenhaw was present and listening when Mr. King advised the defendants to create account receivable entries for "Garland Wynn Joyce – Doors" and "Garland Liberty Grove – Doors" at the meeting on April 8, 2008. Mr. Greenhaw did not raise any objection to the characterization of the anticipated recovery from the Funder America Lawsuit as an account receivable during the meeting. Even if Mr. Greenhaw plugged his fingers in his ears and hummed for the entirety of this portion of the conversation, he knew there were problems with the work ACT had done for Hisaw, and a minimal inquiry would have revealed the nature of the new receivable entries that appeared on the Monthly Report dated as of April 30, 2008.

ACT's Monthly Reports were short and easy to understand. The Monthly Report dated as of April 30, 2008 was obviously different from prior Monthly Reports in that it contained new receivables due from Hisaw. These additional receivables increased the balance due from Hisaw from approximately $50,000 to approximately $125,000. The plaintiff, if it was unaware of the nature of the new receivables, was fully aware that there were problems with the Hisaw projects. The plaintiff nonetheless failed to make any investigation of the addition of new Hisaw receivables. Although Mr. Greenhaw testified that the plaintiff was assuaged by Monthly Report dated as of April 30, 2008, the plaintiff failed to show that its alleged reliance on the Monthly Reports dated from and after April 30, 2008, was reasonable under the circumstances of this case.

### B. 11 U.S.C. § 523(a)(4)

Turning to the plaintiff's § 523(a)(4) claim, the plaintiff asserts that the defendants committed defalcation while acting in a fiduciary capacity when they caused ACT to pledge

10

the proceeds of the Lee Lewis Job to SureTec.  Section 523(a)(4) provides that "a discharge under [the Code] does not discharge an individual debtor from any debt ... for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  The plaintiff argues that the defendants owed them a fiduciary duty because ACT was insolvent when it entered into the Disbursement Agreement.  The plaintiff further argues that the defendants breached this duty by entering into the Disbursement Agreement for the Lee Lewis Job without first obtaining the plaintiff's consent.

When determining whether a particular defendant was acting in a fiduciary capacity for purposes of section §523(a)(4), the Court must look to both state and federal law.  "The scope of the concept of fiduciary under 11 U.S.C. § 523(a)(4) is a question of federal law; however, state law is important in determining whether or not a trust obligation exists."  *LSP Inv. P'ship v. Bennett (In re Bennett),* 989 F.2d 779, 784 (5th Cir. 1993) (relying on *Angelle v. Reed (In re Angelle),* 610 F.2d 1335, 1335-41 (5th Cir. 1980)).  The plaintiff argues that, under Texas law, officers and directors of an insolvent corporation are trustees of the corporation's assets and have a fiduciary duty to deal fairly with the corporation's creditors by, among other things, preserving the value of the corporate assets.  *See, e.g., Tigrett v. Pointer,* 580 S.W.2d 375, 382 (Tex. Civ. App.-Dallas 1978, writ ref'd n.r.e.).  The source of this alleged fiduciary duty is the equitable trust fund doctrine.  *See, e.g., Dyer v. Shafer, Gilliland, Davis, McCollum & Ashley, Inc.*, 779 S.W.2d 474 Tex. App. -- El Paso, 1989) (corporate officer holds usurped opportunity as trustee for the corporation).  "The trust fund doctrine allows a creditor to pursue corporate assets and hold the directors liable for that portion of the assets that would have been available to satisfy his debt if they had been distributed pro rata to all creditors …."  *Tigrett v. Pointer*, 580 S.W.2d at 384.

11

Once a fiduciary duty is established, "the plaintiff need only prove the defendant is guilty of defalcation or fraud while acting in that fiduciary capacity. The plaintiff need not prove embezzlement or larceny." *Council 49, Am. Fed'n of State, County & Mun. Emp. v. Boshell (In re Boshell),* 108 B.R. 780, 783 (Bankr. N.D. Ala. 1989). Defalcation is a willful neglect of duty. *Office of Thrift Supervision v. Felt (In re Felt)*, 255 F.3d 220, 226 (5th Cir. 2001). Unlike fraud, defalcation does not require actual intent, but it does require some level of mental culpability. *See Miller v. J.D. Abrams, Inc. (Matter of Miller)*, 156 F.3d 598 (5th Cir. 1998). The "willful neglect" of a fiduciary duty is "essentially a reckless standard." *Schwager v. Fallas*, 121 F.3d 177, 185 (5th Cir. 1997). Willfulness is measured by an objective standard of what a reasonable person in the debtor's position knew or reasonably should have known. *In re Felt*, 255 F.3d at 226. Thus, under the objective standard, a debtor is charged with knowledge of the law without regard to a subjective analysis of his intent or motive. *Id.*

Here, the defendants lacked the requisite mental culpability. Their conduct was motivated by the bonding requirements for the Lee Lewis Job and was not intended to harm the plaintiff or, more generally, ACT's creditors. The defendants acted openly and did not conceal the existence of the Disbursement Agreement from the plaintiff. Moreover, assuming that a fiduciary duty existed under Texas law, the plaintiff failed to establish that the defendants are liable for any breach of that duty. ACT would not have been awarded the Lee Lewis Job, and the accounts receivable would not have existed, without the Disbursement Agreement. The plaintiff has failed to establish how it was harmed by the defendants' alleged failure to obtain the plaintiff's consent prior to entering into the Disbursement Agreement with SISCO. The Court, therefore, concludes that the plaintiff has

failed to establish a claim under § 523(a)(4) for defalcation while acting in a fiduciary capacity.

### III. CONCLUSION

For all of the foregoing reasons, the Court concludes that the defendants' obligations to the plaintiff as guarantors of ACT's indebtedness are dischargeable. The Court will enter Judgments in each of the adversary proceedings against the defendants consistent with this Memorandum Opinion. With respect to the defendants' oral request for their attorney's fees and costs under § 523(d) of the Code,[1] the defendants may file a motion requesting such fees within fourteen days of the entry of this Memorandum Opinion.

Signed on 7/21/2010

_Brenda T. Rhoades_ SR
HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE

---

[1] This statute permits attorney's fees in certain circumstances as follows:

> If a creditor requests a determination of dischargeability of a **consumer debt** under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

11 U.S.C.A. § 523(d) (emphasis added). The Code defines consumer debt as "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C.A. § 101(8). Several bankruptcy courts have held that the guaranty of a business debt is not a consumer debt. *See Connecticut Nat'l Bank v. Panaia (In re Panaia),* 65 B.R. 865 (Bankr. D. Mass. 1985) (holding that § 523(d) did not apply where debtor gave note an mortgage at issue in order to satisfy as obligations as guarantor of a business debt); *In re Gordon*, 1997 WL 736522 (Bankr. E. D. Pa. Nov. 24, 1997) (holding that § 523(d) did not apply where the debt at issue arose from an individual's guaranty of a business debt).

13